UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

CRIMINAL ACTION NO. 0:20-CR-19-DLB-EBA
UNITED STATES OF AMERICA,                                                              PLAINTIFF,

V.                          **MAGISTRATE JUDGE'S
                             REPORT AND RECOMMENDATION**

RONALD STINESPRING,                                                                     DEFENDANT.
\* \* \* \* \* \* \* \* \*

## I. Introduction

This matter is before the Court on Defendant Ronald Stinespring's motion to suppress electronic evidence seized during a search of his property. [R. 19]. This matter has been referred to the undersigned for a recommended disposition. [R. 6]. Having reviewed the parties' briefs and supplemental filings, for the reasons outlined herein, the Court recommends that the Defendant's motion be denied.

## II. Factual and Procedural History

On March 1, 2019, a 14-year-old girl knocked on a stranger's door in Elliot County, Kentucky. When the occupants of the home answered the door, the girl told them that she was trying to get to her mother's home in Ohio. Troopers from the Kentucky State Police ("KSP") responded to the home and spoke to the girl. At first, she told police that she had come to Kentucky to stay with a friend for the weekend. Police contacted the girl's biological mother, who informed them that she had lost custody of her children and that they were living in Elliot County with the Defendant, Ronald Stinespring. The girl's mother told officers that the girl had

contacted her on Facebook because she did not want to live with Stinespring anymore.

At that time police took the girl to the Elliot County Department of Social Services ("DSS"), where she eventually reported that she had been repeatedly physically abused by Stinespring, her adoptive father. The girl recounted to police that she and her sisters, aged 9 and 18, had been punished by Stinespring in a myriad of ways. She told the troopers that she had been made to sit on a rock for an hour, had been tied up with paracord, had water poured over her, and had been shocked with a stun gun on the tops of her feet, in her armpits, and around her genitals. Troopers confirmed that the girl had burn scars on the tops of both her feet. The girl told police that she had not left Stinesping's property in over two years. Officers testified that she appeared malnourished.

Troopers went from DSS to the Elliot County Attorney's Office, where, with the County Attorney's assistance, they applied for the first in a series of warrants to search Stinespring's property. An Elliot County District Judge approved the warrant. They also obtained a warrant for Stinespring's arrest for criminal child abuse at that time. Stinespring's property was located approximately a mile and a half deep into the woods in a remote part of the county. As they approached the property, police encountered what they believed to be rudimentary roadblocks of logs and downed trees lying across the path. The house was a makeshift cabin constructed of clapboard and surrounded by pigs and goats.

Police tried to make contact with Stinespring from outside the house, but he would not answer them. From outside, they could see Stinespring moving erratically throughout the house. Because Stinespring's two other daughters were still inside, Police made the decision to make entry. One trooper entered the house through the backdoor and told Stinespring that they had a

warrant to search the home. Stinespring attempted to run and exit through the other door, but another Trooper kicked it down and apprehended him, taking Stinespring into custody.

The house was in disarray, with a partial dirt floor and hardly any lighting. As it was late in the day by the time police made it to the home, they were forced to rely on flashlights to see inside the home. Police testified that the home did not appear to have any electricity. One of the troopers managed to locate two flashlight style stun-guns exactly where the girl had told police they would be. Police also recovered a loaded gun and some birth control pills at that time. Given their inability to see well enough to conduct a thorough search, officers decided to leave for the night and resume the following day. During an interview of the children, police learned that there was a phone in the home that might contain evidence that the girl had contacted her mother in Ohio. Police hoped to also find evidence that showed the children had been at the property for a long time, a necessary element of neglect.

The next day, troopers applied for and were granted a second search warrant. They sought to go back to the home in the light of day and attempt to find more physical evidence to back up the girl's allegations of abuse. Officers also hoped to glean a better picture of the conditions in which the girls were living to further their investigation into potential criminal negligence. This second warrant was predicated on the exact same affidavit used to obtain the first warrant, save one additional sentence about electronic devices. That sentence read, "It was discovered after leaving the residence while conducting interviews that there was a computer and a cell phone at the residence that may contain evidence of child abuse and continual residence of the property." [R. 19-2 at p. 2]. As they searched, police uncovered more items that raised their suspicion, including a fetal doppler, the gel for the fetal doppler, and 50 pregnancy tests. Also

during the execution of this warrant police located and seized a box full of hard drives, a computer, and a cell phone. The seizure of these electronic items now forms the basis for Defendant's instant motion.

In order for the Electronic Crimes Branch of the Kentucky State Police to review the contents of the seized devices, troopers sought and were granted a third search warrant. Upon initial review, police located evidence of child pornography on the devices, so troopers were granted a fourth warrant to specifically search the electronic devices for evidence of child exploitation.

The fifth and final search warrant was obtained by police following a forensic interview of the children. During the interview two of the children disclosed physical and sexual abuse, including having photos taken of them. The children described the camera used to take the photos, thus police searched the property again for that camera. Police seized a camera, several blank SD cards, and 40 pounds of potassium nitrate.

On November 18, 2020, Stinespring was indicted for production and possession of child pornography, in violation of 18 U.S.C. § 2251(a) and 18 U.S.C. § 2252(a)(4)(B). [R. 1]. He also faces several state charges. Stinespring brings the instant motion seeking to suppress the evidence seized during the execution of the second search warrant. [R. 19]. Specifically, Stinespring argues that the second search warrant affidavit failed to establish a factual nexus between the allegations of physical abuse and the electronic devices seized. [R. 19-3 at pp. 2]. The United States concedes that the second search warrant fails to establish a nexus, rather they argue that police acted in good faith on the warrant and that the seized items would have inevitably been discovered. [R. 23 at p. 4]. On May 12, 2021, a hearing was held on the matter.

[See R. 29]. Both parties subsequently briefed their positions [R. 32 and 33], and the matter is now ripe for decision.

### III.  Standard of Review

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. In order for a search to be reasonable, law enforcement generally must obtain a warrant, supported by probable cause, from a neutral and detached judicial officer. *Johnson v. United States*, 333 U.S. 10, 13-14 (1948). "Probable cause to conduct a search exists when the facts and circumstances described in the [warrant] affidavit indicate a 'fair probability' that evidence of a crime will be located on the premises of the proposed search." *United States v. Algie*, 721 F.2d 1039, 1041 (6th Cir. 1983); see also *Illinois v. Gates*, 462 U.S. 213 (1983).

Probable cause is determined by the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230 (1983). A judicial officer's determination of probable cause should be paid great deference by reviewing courts. *Illinois v. Gates*, 462 U.S. 213, 236 (1983). Review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit. *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005). "The job of the magistrate judge presented with a search warrant application is 'simply to make a practical or, common-sense decision whether, given all the circumstances set forth in the affidavit . . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "There must, in other words, be a nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (internal citations omitted).

A person who claims to have been aggrieved of a constitutional violation bears the initial burden of production and persuasion to suppress evidence. *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986). Once the defendant has made basis for his motion, the government then has the burden of demonstrating that there was not a constitutional violation. See *United States v. Bradley*, 163 Fed. Appx. 353, 357 (6th Cir. 2005) (citing *United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974); *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)). The controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence. *Matlock*, 415 U.S. at 177 n. 14.

IV. <u>Analysis</u>

Stinespring seeks to suppress the evidence recovered as a result of the second search warrant executed at his property. Stinespring bases his motion on two grounds: (1) the second warrant affidavit was facially deficient and lacked probable cause for the issuance of a search warrant but also eliminates any retreat to the good faith exception; and (2) the second warrant does not conform to the basic legal structure of a search warrant. [R. 19-3 at p. 2]. Specifically, Stinespring alleges that the second search warrant affidavit is a cut and paste version of the first affidavit with one sentence regarding the electronic devices appended at the end. [R. 19 at p. 3]. Missing from the second affidavit is a nexus between the place to be searched and the electronic evidence sought. [*Id.*]. Since the United States concedes the absence of the nexus [R. 23 at p. 6], the Court will analyze the execution of the warrant under the so-called "good faith exception" and the doctrine of inevitable discovery.

The United States contends that the evidence seized during the execution of the second search warrant would have inevitably been discovered. Specifically, the government asserts that,

although the second search warrant lacked a sufficient nexus to establish probable cause to seize the electronic items, those items would have been covered by the fifth and final search warrant, granted after the children alleged during their forensic interview that they were sexually abused by Stinespring. [See R. 33 at pp. 5-7].

The inevitable discovery doctrine provides an exception to the exclusionary rule and allows even unlawfully obtained evidence to be admitted at trial if the Government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means had the government misconduct not occurred. *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). Proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." *Id.* "The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995) (quoting *United States v. Eng*, 971 F.2d 854, 861 (2nd Cir. 1992)). The inevitable discovery exception permits admission of the evidence if the Government can demonstrate (1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct; (2) that the police possessed the leads making the discovery inevitable at the time of the misconduct; and (3) that the police were actively pursuing an alternate line of investigation prior to the misconduct. *Kennedy*, 61 F.3d at 499.

Stinespring does not dispute that the forensic interviews of the children yielded information which would have independently supported probable cause to search the electronic

devices seized during execution of the second search warrant. Rather he argues that the unlawful discovery of the evidence in the second search warrant tainted any of the subsequent three search warrants from that point forward. [R. 32 at pp 5-6]. He asserts that police had already concluded their examination of the electronic devices and discovered all of the evidence of child exploitation some time before the forensic interview ever occurred, thus anything garnered from it cannot be the product of an independent or alternate investigation. [*Id*. at p. 6].

The United States attempted to remedy this assertion through testimony of KSP officers at the suppression hearing. Indeed, officers confirmed that the forensic interviews of the children would have occurred based solely on the allegations of physical abuse, regardless of the discovery of child exploitation material. [R. 31 at 156-57 and 186-87]. However, what was unclear from the testimony is whether the discovery of the evidence of child exploitation drove the content of the forensic interview. The United States provided no testimony regarding what questions and topics are typically covered during a child's forensic interview, nor whether the interviewer explicitly sought information about sexual abuse based on the evidence police had already unlawfully uncovered.

The Court agrees that the evidence would have likely been found, but for the police misconduct, thereby satisfying the first prong of the *Kennedy* test. However, it is not immediately clear that the second and third prongs are satisfied here. While certainly a close call, the government fails to demonstrate that police possessed the lead making the discovery inevitable prior to the misconduct. In fact, at the time police applied for the second search warrant they had not uncovered any of the evidence that initially raised their suspicion that sexual abuse might have occurred (i.e. pregnancy tests, fetal doppler, etc.). Nor, as outlined

above, did the government show that the information revealed during the interview was in fact part of an independent untainted line of investigation.

Though not subject to the inevitable discovery doctrine, suppression of the electronic evidence in this case is inappropriate nonetheless. As the government points out, officers did rely in good faith on the second search warrant, even though it did not sufficiently establish a nexus between the items searched and the crime alleged.

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). However, if the evidence was "obtained in objectively reasonable reliance" on a "subsequently invalidated search warrant," it should not be suppressed. *United States v. Brown*, 828 F.3d 375, 385 (6th Cir. 2016) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984). In order for this so-called good faith exception to apply, an affidavit must contain "a minimally sufficient nexus between the illegal activity and the place to be searched." *Id*. The good faith exception does not apply when an affidavit so lacks indicia of probable cause that belief in the existence of probable cause would be objectively unreasonable. *United States v. Rose*, 714 F.3d 362, 367 (6th Cir. 2013). Similarly, the exception does not apply where the issuing judge was misled by false information in the affidavit. *Leon*, 468 U.S. at 923.

The standard by which an affidavit is judged for purposes of good faith is less demanding than the threshold to prove the existence of probable cause in the first place. *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004). However, affidavits that are "so lacking in indicia of probable cause that they contain only suspicions, beliefs, or conclusions, without providing

some underlying factual circumstances regarding veracity, reliability, and basis of knowledge" are known as "bare-bones" affidavits. *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (quoting *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996)). Those bare-bones affidavits are precluded from application of the good faith exception. *Id*. Like a probable cause determination, a court reviewing for good faith is "bound by the four corners of the affidavit." *Id*. at 751. The relevant question is whether the officer reasonably believed that the warrant was properly issued, not whether probable cause existed in fact. *Carpenter*, 360 F.3d at 598 (Gillman, J., concurring).

Stinespring does not allege that the issuing judge was not neutral or detached, nor does he allege that the affidavit contained false information. Stinespring instead argues that the warrant is facially deficient, relying on the holding of *Groh v. Ramirez*, 540 U.S. 551 (2004). [R. 32 at pp. 1-2]. In *Groh*, the Supreme Court found a warrant to be invalid that did not identify with particularity the items to be seized. *Groh*, 540 U.S. at 554. The Court specifically took issue with the warrant's failure to incorporate by reference the warrant application, which did adequately describe the items to be seized. *Id*. at 558. The Court went on to hold that, under those circumstances, the good faith exception does not apply. *Id*. at 558. Stinespring's reliance on this case is misplaced, however, as the instant warrant does incorporate the accompanying affidavit by reference, which does describe with particularity the items to be searched and seized. [R. 19-2 at p. 3 (". . . there is probable and reasonable cause for the issuance of the Search Warrant as set out in the affidavit attached hereto and made a part hereof as if fully set forth herein.")].

Stinespring further asserts that the warrant was "so facially deficient, i.e., in failing to particularize the nexus between the electronic evidence and evidence of criminal conduct to be

seized that the executing officer cannot reasonably presume it to be valid." [R. 32 at p. 3]. The United States has indeed conceded that the warrant lacked a sufficient nexus to establish probable cause. [R. 23 at p. 23]. However, the Court disagrees with Stinespring's contention that the absence of a sufficient nexus means that an executing officer cannot reasonably presume the warrant valid.

Simply put, the evidence was obtained in objectively reasonable reliance on a warrant that, while both parties agree is invalid, should not be suppressed. The search warrant at issue was not "bare-bones" or lacking in indicia of probable cause such that it included mere suspicions, beliefs, and conclusions. Notably, the second search warrant was not obtained solely for the purpose of obtaining the electronic evidence. Officers testified and the affidavit language indicates that the warrant was obtained, at least in part, to continue the search and documentation of the premises that police were forced to abandon the day before. [see R. 31 at pp. 150-51 and 184-86]. The first warrant to search the property for evidence of physical abuse was granted the day before on an almost identical affidavit, thus the second warrant certainly cannot be so lacking in indicia of probable cause that the executing officer would not reasonably presume its validity. While the warrant lacked a nexus for the electronic items, it described with particularity the officers' purpose of documenting the living conditions and looking for evidence of abuse and neglect. Since that portion of the affidavit was not bare bones in the context of a probable cause analysis, it certainly is sufficient under the less restrictive good faith analysis. See *Carpenter*, 360 F.3d at 595.

Further, the challenged warrant, along with all of the others, were prepared in conjunction with the Elliot County Attorney, further bolstering its perceived validity. While not conclusive,

officers' consultation with an attorney is certainly indicative of good faith on their part. *See United States v. Bynum*, 293 F.3d 192, 198 (4th Cir. 2002).

Stinespring seems to hinge his argument on the notion that, because the warrant lacks the sufficient nexus to the electronic items, the good faith exception cannot apply. Good faith, however, only requires a "a minimally sufficient nexus between the illegal activity and the place to be searched." *Brown*, 828 F.3d at 385. The affidavit indicates, "It was discovered after leaving the residence while conducting interviews that there was a computer and a cell phone at the residence that may contain evidence of child abuse and continual residence of the property." [R. 19-2 at p. 2]. Assertions that an executing officer's reliance on a search warrant was not in good faith can be overcome with a "modicum of evidence, however slight, to connect the criminal activity described in the affidavit to the place to be searched." *Laughton*, 409 F.3d at 749. While insufficient to establish probable cause, the warrant certainly contains a minimally sufficient nexus between the illegal activity and the place to be searched.

Taken together, the evidence weighs in favor of an application of the good faith exception. The search warrant was not so lacking in indicia of probable cause or so facially deficient that the officers would have been unreasonable in relying on it to seize the electronic evidence. Since the affidavit cannot be said to be "bare-bones" and does contain a minimally sufficient nexus, the good faith exception should apply.

V. Conclusion

For the above reasons, it is RECOMMENDED that the Defendant's Motion to Suppress [R. 19] be DENIED.

Specific objections to this Report and Recommendation must be filed within fourteen

(14) days from the date of service thereof or further appeal is waived. *United States v. Campbell*, 261 F.3d 628, 632 (6th Cir. 2001); *Bituminous Cas. Corp. v. Combs Contracting Inc.*, 236 F. Supp. 2d 737, 749–50 (E.D. Ky. 2002). General objections or objections that require a judge's interpretation are insufficient to preserve the right to appeal. *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004); *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). A party may file a response to another party's objections within fourteen (14) days after being served with a copy thereof. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).

    Signed July 9, 2021.



Signed By:
Edward B. Atkins  *EBA*
United States Magistrate Judge