1

1     UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF KENTUCKY
2     NORTHERN DIVISION at ASHLAND
                   - - -
3
      UNITED STATES OF AMERICA,      : Docket No. 20-cr-19
4                                    :
                         Plaintiff,  : Ashland, Kentucky
5                                    : Monday, October 17, 2022
                                     : 10:00 a.m.
6     versus                         :
                                     :
7     RONALD STINESPRING,            :
                                     :
8                        Defendant.  :

9                    - - -
              TRANSCRIPT OF SENTENCING
10             BEFORE DAVID L. BUNNING
       UNITED STATES DISTRICT COURT JUDGE
11                   - - -

12    APPEARANCES:

13    For the United States:      ERIN ROTH, ESQ.
                                  U.S. Attorney's Office
14                                260 W. Vine Street
                                  Suite 300
15                                Lexington, KY 40507

16    For the Defendant:         MICHAEL J. CURTIS, ESQ.
                                  Curtis Legal Services, PSC
17                                1544 Winchester Avenue
                                  Suite 708
18                                Ashland, KY 41101

19    Court Reporter:            LISA REED WIESMAN, RDR-CRR
                                  Official Court Reporter
20                                35 W. Fifth Street
                                  Covington, KY 41011
21                                (859) 291-4410

22

23

24
          Proceedings recorded by mechanical stenography,
25    transcript produced by computer.

1          (Proceedings commenced at 10:08 a.m.).

2              THE COURT:  Madam Clerk, if you would call the matter

3      scheduled for 10:00, please.

4              COURTROOM DEPUTY:  Ashland criminal action 20-cr-19,

5      United States of America versus Ronald Stinespring for

6      sentencing.

7              THE COURT:  If we could start with entries of

8      appearance, please.

9              MS. ROTH:  Good morning, Your Honor.  Erin Roth on

10      behalf of the United States.

11              MR. CURTIS:  Good morning, Your Honor.  Mike Curtis

12      here with Mr. Stinespring.

13              THE COURT:  All right.  Mr. Stinespring, let me first

14      confirm that you have received the presentence report that was

15      prepared.

16              THE DEFENDANT:  Yes.

17              THE COURT:  Did you have a chance to review that with

18      your lawyer?

19              THE DEFENDANT:  Yes.

20              THE COURT:  All right.  You all can have a seat.

21          Before we get to the objections which have been lodged,

22      let me just confirm, Mr. Curtis, last week, you filed a notice

23      indicating that you did not wish to have -- your client did

24      not need to have a restitution hearing.  That's docket 103.  I

25      want to confirm that.

1          MR. CURTIS:  That is correct, Your Honor.  And at the

2    direction from Mr. Stinespring, I filed that notice.

3          THE COURT:  What is your position going to be on the

4    amount?  The restitution, we've got three actually very

5    thorough reports with recommendations.  I haven't received

6    anything from you.  So I don't know -- what's your position is

7    on it?

8          MR. CURTIS:  As far as our position is, we're not

9    contesting it.

10          THE COURT:  Is that correct, sir?

11          MR. CURTIS:  You have to say yes or no.

12          THE DEFENDANT:  Yes.

13          THE COURT:  Have you talked to your lawyer about

14    that?

15          THE DEFENDANT:  Yes.

16          THE COURT:  It's your position that you're not going

17    contest the issues regarding restitution?

18          THE DEFENDANT:  That's right.

19          THE COURT:  Fair enough.  You can have a seat.

20       Okay.  Now, the objections themselves, there are three

21    categories of objections.  The first category are to factual

22    portions of the presentence report.  There are particular

23    paragraphs; paragraphs 8, 15, 18, 22, and 23.  Primarily, the

24    general objection to those paragraphs is -- I'm paraphrasing,

25    of course, Mr. Curtis, but they involve things that are more

4

1    appropriately considered by the state court.

2         And then we've got two substantive objections:  A

3    two-level enhancement for restraining a victim in the course

4    of the offense, and that would be a two-level enhancement

5    under 3A1.3.  And then a two-level enhancement for obstruction

6    of justice pursuant to Section 3C1.1.

7         So those are the objections we need to take up, and then

8    I'll have some questions regarding whether or not there's

9    going to be any statements.  I know I've received a number of

10   victim statements.  The actual victims, of course, have a

11   right to address the Court, and I want to confirm a couple

12   things with you, Ms. Roth.

13        We'll start with the objections themselves.  These

14   statements that were given, the various statements of the

15   minor victims when they were initially interviewed and then

16   subsequently interviewed, they are -- Mr. D'Alessandro, they

17   are part of what's been incorporated into the presentence

18   report, correct?

19             PROBATION OFFICER D'ALESSANDRO:  Yes, Your Honor.

20             THE COURT:  Do you intend on calling any witnesses,

21   or do you just want to rely upon what was in the presentence

22   report?

23             MS. ROTH:  We don't intend to call witnesses.  As the

24   Court's indicated, we do have victims present here today who

25   do wish to make statements to the Court.

1    In terms of testimony, I don't believe it's needed.  I

2    don't actually think that there seems to be much of a factual

3    dispute about what is said, just whether that information is

4    relevant to the crimes charged, as I read the objections of

5    the defendant.  And we obviously have a position on that.

6         THE COURT:  Sure.  I'll let you be heard first.

7    Let's take up, first of all, the factual portions, those

8    paragraphs I dealt with, 8, 15, 18, 22, and 23.  I guess that

9    kind of dovetails into the restraining enhancement as well.

10        MR. CURTIS:  Correct.  Judge, the reason being is

11   Mr. Stinespring is currently charged with numerous criminal

12   abuse in the first degree counts in state court in Sandy Hook,

13   Kentucky.

14   And I understand the case law that was cited by the

15   government.  Not only do we have to attack the relevancy, but

16   also the veracity of the factual basis.  However, he's in a

17   peculiar situation right now to where in the state action, he

18   maintains that presumption of innocence.  That presumption of

19   innocence is not removed until he enters a plea of guilty or

20   until a jury finds him guilty of such charges.

21        THE COURT:  I appreciate that.  Sure.

22        MR. CURTIS:  Therefore, he has a Fifth Amendment

23   right to remain silent.  That puts us between the rock and the

24   hard place.

25        THE COURT:  Let me stop you there.  Do you contest

1    the fact that the minor victims made the statements they've

2    made?  You may not believe it's relevant, but do you contest

3    the actual -- some of them may have been videotaped, some of

4    them may not have, but you were provided all of that in

5    discovery.

6            MR. CURTIS:  I was provided all that, and those

7    statements were made.

8            THE COURT:  All right.  Fair enough.

9            MR. CURTIS:  I cannot dispute that.  Those statements

10   were made.

11       However, as it pertains to the Rule 32(b)(1)(C), there

12   has to be, in order for the Court to consider it, there has to

13   be not only the relevancy but also the factual basis.

14       Now, the fact that it was made doesn't mean it's true.

15           THE COURT:  Well, but there's no evidence to the

16   contrary.

17           MR. CURTIS:  Well, I can't present evidence to the

18   contrary because of his charges pending in state court.  So

19   that puts him and me behind the 8 ball.

20           THE COURT:  I appreciate that.  I do.

21       What's your position on that, Ms. Roth?

22           MS. ROTH:  Well, I would note that in this case, I'm

23   not even sure that it makes a difference in the guidelines.

24   While it obviously does go to the two levels, Mr. Stinespring

25   was well above a 43 in this case.  His guideline range was in

1    the 50s.  So even if two levels aren't applied, he would still

2    end up at the same guideline range.  So in that way, whether

3    it is applied or is not I'm not sure has much of an actual

4    implication here.

5        I will say that he doesn't lose his presumption of

6    innocence in state court by these proceedings.  I believe that

7    if he would like to contest, he certainly could.

8        The restraint actually resulted in this case in physical

9    scarring for both of the victims in this case, and that has

10   been shown to the defendant and his attorney through

11   discovery.  So, again, I think that the fact of trying to

12   contest that here is not well taken.

13           THE COURT:  You acknowledge that the guideline range,

14   whether I enhance two levels for restraint or not, whether I

15   enhance two levels for the obstruction or not, this is at the

16   very bottom.  I know it's column 1, but it's still at the very

17   bottom.  So whether I agree or disagree with your position,

18   it's still the same guideline range?

19           MR. CURTIS:  Correct.

20           THE COURT:  You've talked to him about that?

21           MR. CURTIS:  Yes.

22           THE COURT:  All right.  In essence, you acknowledge

23   that the statements in paragraphs 8, 15, 18, 22, and 23 were

24   made, but you believe that because they involve issues

25   relating to the state court, there's really no -- you can't

1    attack the veracity of that here, according to you, you

2    believe I should not be considering those things?

3            MR. CURTIS:  That is correct.

4            THE COURT:  All right.  Look, we have everybody here.

5    This is the actual sentencing date for Mr. Stinespring.

6    Victims are here.  I think it's important that we, to the

7    extent possible, make rulings.  Whether or not the rulings

8    make any practical difference from a guideline perspective --

9    oftentimes, I will just make a comment that under

10   Rule 32(i)(3)(B), a ruling isn't necessary because it doesn't

11   impact the guidelines.

12       Here, given the seriousness of the offenses, given the

13   fact that I don't want this case to come back unnecessarily --

14   I can't control what the Court of Appeals does, but I don't

15   want to give them a reason to send it back that would be

16   unnecessary.  I'm going to make some rulings.  I think it's

17   important to do so here.  This case has gotten a lot of

18   interest, and for good reason.  Very, very, very serious

19   charges are involved here.

20       So as it relates to paragraph 89, the objection will be

21   overruled.  The information is proper background evidence

22   which is within the scope of the information the Court can

23   consider for sentencing.  The information that came from

24   Victim Number 1 in paragraph 8 will not be excluded.

25       Paragraph 15, same ruling.  The statements made by

1   Victims 1 and 2 are relevant.  Just because they may be

2   perhaps also relevant or perhaps more relevant for the state

3   court case does not preclude the Court from considering their

4   statements at sentencing.  In fact, 18 U.S. Code Section 3661

5   allows the Court to consider this type of evidence at

6   sentencing so paragraph 15 will also not be excluded.

7        Same ruling on paragraph 18.  Victim 2's statement will

8   not be removed.

9        And then paragraphs 22 and 23, evidence regarding the

10  defendant's use of tasers and/or branding as described by the

11  victims is relevant for sentencing under 3661 and will not be

12  stricken from the presentence report.

13       This information in these paragraphs is also within the

14  scope of relevant conduct under 1B1.3 of the guidelines.  The

15  Court can consider all acts committed by a defendant that

16  occurred during the commission of the offenses, in preparation

17  for those offenses, and all harm that may have resulted from

18  his actions.

19       The information in paragraphs 8, 15, 18, 22, and 23 all

20  fall within that relevant conduct definition and may be

21  considered in determining the appropriate sentence.

22       With respect to the restraint enhancement, this is

23  restraint of a victim in the course of the offense.  "In the

24  course of the offense" is language that the sentencing

25  commission uses.  Now, he pled guilty to three counts of

1    production of child pornography, possession of child

2    pornography, and tampering with a witness.

3        Ms. Roth, this particular enhancement, I realize you

4    addressed it just briefly earlier.  But specifically here, the

5    offense and the course of the offense, can you kind of walk me

6    through why you believe that's appropriate here?

7        MS. ROTH:  Yes, Your Honor.  The language that is

8    used in 2251, which is the production of child pornography

9    statute, lists a series of verbs.  And the series is that the

10   defendant employed, used, persuaded, induced, enticed, and

11   coerced a victim into sexually explicit conduct for purposes

12   of producing a visual depiction of that conduct.

13       In this case, the evidence really is that these victims

14   were persuaded, induced, enticed, coerced -- pick the verb --

15   through a series of actions by this defendant, including fear,

16   violence, and manipulation, and this is just one example of

17   that.  I could list so many, as the presentence report

18   detailed some of those.

19       We certainly believe that while those may be the subject

20   of separate state charges, they're absolutely relevant here to

21   showing how this defendant coerced and used these victims for

22   his own purposes, which included producing visual depictions

23   of sexually explicit conduct.  We do have images both from

24   before and after the branding because we can see the physical

25   scarring.

1            THE COURT:  They don't contest the scarring itself.

2      They just believe --

3            MS. ROTH:  Correct.  This is in terms of timing,

4      right?  So we have pictures from before, and we have pictures

5      after.  So we can say that it happened during the timing that

6      these offenses were occurring that are charged in the

7      indictment, and that's why the United States believes that

8      they are properly considered part of the course of the offense

9      in this case.

10           THE COURT:  All right.  Fair enough.

11        Response?

12           MR. CURTIS:  Judge, just briefly, these are all

13     photos, as I mentioned.  And some of them aren't even

14     explicit, as that term is defined under the statute.

15        There was probably just a few in which there was an

16     exposure of the genitalia explicitly.  Otherwise, they were

17     just like --

18           THE COURT:  Hold on.  We had this conversation when I

19     took his plea.  We took a recess, came back.

20           MR. CURTIS:  I understand.  But what I'm trying to

21     point out is that it wasn't in the course of the conduct.  He

22     didn't use a gun.  He didn't use anything.  These photos show

23     exactly what they purport to portray.

24           THE COURT:  If these victims felt intimidated based

25     upon what they have on this branding that she described and --

1          MR. CURTIS:  But --

2          THE COURT:  Hold on.  Let me finish.

3      -- and therefore would have done what he asked them to do

4  because they felt in fear, wouldn't that apply here?

5          MR. CURTIS:  Judge, because it wouldn't be in the

6  course of the offense.  The course of the offense is when the

7  offense happens.

8          THE COURT:  Does that also include relevant conduct,

9  though?

10          MR. CURTIS:  Well, I think --

11          THE COURT:  The answer is yes, it does.

12          MR. CURTIS:  It has to, yes.

13          THE COURT:  If you read the guideline itself, the

14  base offense level and any specific offense characteristic

15  includes -- is determined by relevant conduct.

16          MR. CURTIS:  Right.

17          THE COURT:  That's what it says in 1B1.3.

18          MR. CURTIS:  I understand the statute, which gives

19  the Court great discretion in regards to the history and

20  characteristics, all of that, because that's very plain.

21  That's what Congress said, and that's what we have to follow.

22      But at the same time, you're asked to make a factual

23  determination.  And, you know, these statements were made, but

24  at no time was any statement ever made that they were forced

25  to take those pictures.  I have not seen any evidence of that.

1            THE COURT:  All right.  I'm going to overrule this

2      objection with the caveat that even if the Court were to

3      sustain the objection, it would not make a practical

4      difference in what the guideline range is.

5            As stated by Victims 1 and 3, the defendant did brand

6      them while they were being held against their will by the

7      defendant.  They were adopted by the defendant.  They were

8      under his care, custody, and control.

9            In the Court's view, this conduct was done, in part, to

10     coerce them to ultimately allow the defendant to be able to do

11     what he wanted; to take pictures of them, to do the other

12     despicable acts he did with them while they were in his

13     custody, care, and control.

14           Also, based upon Victim 1's statement, the branding was

15     punishment for her plan to get out of the house and report the

16     defendant to the police.  The defendant's actions were

17     designed to ensure that that would not occur and that she

18     wouldn't leave and showed that there would be adverse

19     consequences for doing so.

20           This conduct is also sufficient -- or this conduct is

21     sufficient, in the Court's view, to warrant the two-level

22     restraint enhancement pursuant to Guideline Section 3A1.3.

23           Now, the final substantive objection is the 3C1.1

24     enhancement.  Mr. Curtis, this one is much more

25     straightforward.  Your client pled guilty to Count 5,

1    tampering with a witness.  Based upon his guilty plea to

2    Count 5, you're not contesting paragraphs 29 and 30 of the

3    presentence report, which outline his conduct related to the

4    obstruction, are you?

5         MR. CURTIS:  No.

6         THE COURT:  This one is simple.  If the defendant had

7    been successful in convincing Victim 3 to exculpate him and

8    inculpate her, would that have materially affected the case?

9    If that cryptic letter that was --

10        MR. CURTIS:  I'm very familiar with it.

11     Yes, it would.

12        THE COURT:  Thank you.  The objection to the

13   recommended two-level enhancement is going to be overruled.

14   The coded letter that serves as the basis for Count 5 was the

15   defendant's attempt to have Victim 3 lie in an effort to

16   exculpate him.  This is about as blatant an obstruction

17   enhancement as there is under the guidelines.  His attempt to

18   solicit Victim 3 to provide false testimony clearly meets the

19   definition of obstruction.  His objection is therefore

20   overruled.

21      The total offense level is 43, even though the

22   application of the guidelines would otherwise be higher; in

23   fact, far higher, even with the three levels off for

24   acceptance.

25      You are moving for the third level for all three counts?

1          MS. ROTH:  We are.

2          THE COURT:  That motion is granted.  The guidelines,

3    based upon application of the sentencing table, nothing is

4    higher than a 43 even if the scoring ends up being higher than

5    43.

6          So we have a category 1 criminal history, total offense

7    level of 43.  The guidelines call for life for each count.

8    However, each count has statutory maximum penalties which are

9    less than life so a life sentence would not be legal, if you

10   will, for purposes of each particular count.

11         Now, turning to the restitution.  Without objection, the

12   request for restitution will be granted.

13         Madam Clerk, if you will put in the minutes that the

14   defendant did not contest the request for restitution.  Make

15   sure that is reflected in the minutes.

16         Now, as far as victim statements, the statements are the

17   three that were filed under seal.  I have had a chance to look

18   at those.

19         I've also looked at the filings regarding restitution

20   from Emily Skaggs.  There are two of them by Emily Skaggs and

21   then an additional one by Winds of Change Therapy.  That's

22   Mandi Cecil.

23         They have a right to address the Court.  Now would be the

24   appropriate time.

25         MS. ROTH:  Yes, Your Honor.  In terms of restitution,

1    we would request that any amounts gathered be divided into

2    thirds and each victim be paid, instead of proportionally with

3    the amounts of their restitution --

4              THE COURT:  One is much higher than the other because

5    she's much --

6              MS. ROTH:  Correct.  My understanding is that it may

7    require collection to be so high to be able to divide it

8    proportionally like that.  We would request that it be paid,

9    any amounts, one-third to each victim.

10             THE COURT:  I'll order that.  That's appropriate.

11   Frankly, I don't know if there's any potential recovery.

12   Unlike fines, restitution is a different animal.

13             MS. ROTH:  This is Victim 3, who would like to

14   address the Court.

15             THE COURT:  Good morning.  Take your time.

16             VICTIM NO. 3:  Your Honor, before determining a

17   sentence for Ronald Stinespring, I wanted to give you some

18   examples of how his actions have impacted my life.

19        I first met the Stinesprings at 12 years old, when my two

20   sisters and I were put up for -- put into foster care, and we

21   were adopted three years later.

22        After the adoption took place, Ronald moved us to

23   Kentucky and so the abuse got much worse.  There isn't a day

24   that goes by I'm not haunted by the memories of what he's

25   done.  Looking back now, I can see from the first day I was in

1    the house with Ronald, he started the process of getting into

2    my head.  I never had a good father figure, and I didn't know

3    how normal families interacted behind closed doors.

4         In addition to that, I had the desire to have a stable

5    home.  I was manipulated by the defendant in some of the most

6    extreme ways to the point of being held within his mental grip

7    for three years after his arrest in March of 2019 after he

8    could no longer call in January of 2022, where I was finally

9    able to get away from mind games and start mental healing.

10        That being said, I struggle daily with depression,

11   anxiety, nightmares, and overall distrust for other people,

12   especially those who are in a position of power over me.

13        My mind, body, soul, and youth were stolen from me, and

14   now it's time to go beyond my abuse.  To move forward in life

15   with the burden of my past, I ask that the sentence given to

16   Ronald would reflect the pain that my sisters and I suffered

17   and will continue to work through the rest of our lives.

18   Thank you.

19             THE COURT:  How old are you right now?

20             VICTIM NO. 3:  I'm 22.

21             THE COURT:  Okay.  Thank you.

22        Ms. Roth?

23             MS. ROTH:  Victim 1, Your Honor.

24             THE COURT:  The minutes will reflect the initials of

25   each victim, even though they're all --  how old are you,

1    ma'am?

2            VICTIM NO. 1:  18.

3            THE COURT:  The two of these individuals are adults,

4    but I'm going to continue to use the initials in the minutes.

5        You may go ahead.  Good morning.

6            VICTIM NO. 1:  Your Honor, there are things I would

7    like to address to you about how the actions of the defendant

8    have and will continue to affect me daily.

9        One of the most common things that the defendant would

10   say is that he'd never do anything to cause permanent damage.

11   But with that being said, there are so many mental and

12   physical damages that have been done, you can't have physical

13   pain and physical trauma without the mental.

14       There's not a single day that goes by that my past does

15   not have a negative impact on me.  I've been to many doctors,

16   and I've been diagnosed with severe cases of PTSD, depression,

17   and anxiety.  I have nightmares and night terrors every night.

18   Sometimes I even wake up crying, drenched in sweat, because it

19   just seems so real.

20       I've struggled with suicidal thoughts and have attempted

21   many times.  I've been hospitalized three times for those

22   thoughts.  And in the past, I've heard voices and seen visions

23   of stuff that has either been done to me or things I've heard.

24       I struggle very much with my self-image.  I never feel

25   like I'm good enough.  He has told me that I'll never be good

1     enough and how people will only want me for my body and for

2     the things I can do.  And pretty much, to this day, I still

3     believe it, and I feel I will always believe this.

4          I also have severe trust issues.  I only have a small

5     group of people that I trust.

6          With everything that the defendant has done, there will

7     never be anything that can be done to fix it or to undo it.  I

8     was constantly brainwashed while living with the defendant,

9     and I was in a constant state of fear for my life and my

10    safety.

11         Not a day goes by that I'm not affected by my anxiety.

12    I've not felt comfortable in my own body in years.  I carry

13    many scars on my body from my past, many of which are

14    physical -- are from the physical abuse and trauma.  There are

15    also a ton of mental that can't be seen with the naked eye,

16    but they're there.  Through the years, I've been dealing with

17    them, but they'll never go away.

18         I'm very socially awkward and shy, and I feel the reason

19    for this is that he took me out of school in fifth grade and

20    then moved my sisters and I to a secluded place.

21         I'm extremely jumpy.  Sometimes simple noises like

22    somebody starting to talk to me will make me jump.  Loud

23    noises as well, such as sudden noises and shadows, scare me.

24         A whole different type of trauma is watching my sister go

25    through the same type of pain.  It causes its own scars.  To

1   this day, I wish I could go back and change it all.  I've not

2   seen my little sister in over two years.  I'm a huge trigger

3   for her.  That's from where I was made by the defendant to do

4   sexual acts on her and punish her the way that he would her.

5   She hates me.  For safety reasons, she was removed from my

6   home.

7        I was taught at a young age that you must please your

8   parents.  The way I was taught, I know them to be wrong.  I

9   know them now to be wrong.  I was taught that there were

10  consequences if I had a thought or idea that strayed away from

11  his own.

12       All I ever wanted was to be loved and for my sisters and

13  I to be happy.  The truth is the truth, and the past is the

14  past.  You can't run from it, and you can't hide it.

15       There was a thing he called end game.  End game was when

16  he was so unhappy with his life that he would kill us and then

17  kill himself.  It had gotten to that point many times, but we

18  were able to talk him down, but things kept getting worse and

19  worse.

20       Then this one time, he started to suffocate me but then

21  stopped because I wasn't fighting him.  He said it himself.

22  "You are so unhappy that you would let me kill you."  And it

23  was the truth.  I'm glad he didn't because I never would have

24  been able to run away.

25       But this isn't just me that we're talking about.  All of

1     this happened to my two sisters as well.  I had to watch it

2     happen and not do anything about it.  It's a whole different

3     level of trauma, not being able to make it stop and protect

4     them from him.  I can't speak for them.  This is just the way

5     I see the whole situation.

6          I'm always affected by this, and I have good days and bad

7     days.  I'm always scared, and I'm always sad because of it.

8     It's altered my life to the point of feeling broken, and I

9     feel like I haven't done anything so wrong to deserve it all.

10         I will be serving a life sentence for the pain and

11    anguish for all of this.  I hope that Brent will suffer some

12    sort of guilt or remorse for the permanent consequences my

13    sisters and I will be living with and paying for for the rest

14    of our lives.

15         Thank you.

16              THE COURT:  Thank you.

17              MS. ROTH:  Your Honor this is M.P. and J.P., who are

18    foster parents for Victim 2, and they're here --

19              THE COURT:  This is the younger sister she was just

20    referencing?

21              MS. ROTH:  They're here on her behalf, Your Honor.

22              THE COURT:  Thank you.

23              M.P.:  Your Honor, my name is M███████, and this is

24    J████.  We're foster and adoptive for M██████.  My husband and

25    I have been prayerful about who to add into our home for

several years.  We adopted three and had room for one more

girl.  We found M████ and applied to have her in our home

and were contacted regarding starting the steps to meet with

her.

My husband and I were advised on the first phone call

regarding M████'s extensive abuse, trauma, behavior, and

needs.  The caseworker was purposeful in letting me know key

points of trauma she endured so that we could decide on

placement.

My husband and I opened our hearts to her without

hesitation.  We met with her on Zoom calls, mailed letters to

each other, and finally got to meet in person.  There is no

doubt in our minds that she is perfect in our home.

I'm sorry.

M████ has had a past that is heartbreaking to hear.

She does not tell a story of a day in the life, but she does

communicate specific events and memories.  The events and

memories are horrific in description and detail.  She cannot

make it through a full day without several of these memories

surfacing and causing her to interrupt her current thoughts or

whatever she is working on.

She'll share these thoughts with myself, her dad, her

teacher or therapist.  We all have heard trauma stories and

events that are part of her living past.  She still lives very

much in the past by revisiting memories, trying to use coping

skills to get through them, fighting depression, battling self-worth, and trying to let go to live in a safe and better future.

She does battle depression, has thoughts of suicide, and can hear voices of those who have abused her in her head telling her to just kill yourself.  She will cause herself harm by hitting her head against things, anything close, or she will scratch her arms with her fingers.  Her thoughts are overwhelming to her, and she battles the right that she has to live a happy and loving life.

M█████ struggles with her education due to not being allowed to be taught in school.  She is officially in seventh grade but at a second or third grade reading and math level. She is incredibly smart, and we have every reason to believe that she can close her gap in education with work, tutoring, and all the support of her established IEP and 504.

The ability is there, but her belief in herself puts up a huge wall for her and her educators to overcome.  She will often refuse to work if she isn't in the frame of mind to complete it or if she sees it as too difficult.  She'll then often then make threats to hurt herself if she's made to do the work.

Emotionally, M█████ displays toddler behaviors.  If she's told no or receives an answer she doesn't like, she will often cry, drop to the floor in a tantrum, slap herself on the

1 head, hide her head in her shirt, or run into her room and

2 throw herself on the bed.  The behavior is irrational,

3 nonresponsive to helping or reminding her to use coping

4 skills.  She'll scream or cry, and this can last anywhere from

5 5 to 30 minutes.  She wears herself out with these behaviors

6 and in these moments is unable to be consoled.

7 Every time Jerry and I believe we know all of the trauma

8 and all of her behaviors, we learn something new.  We learn

9 more about the abuse she endured and the healing she needs at

10 every breaking point she has, every therapy session and every

11 time she needs admitted to a mental hospital for suicidal

12 thoughts.

13 She is worth every bit of effort on our part, on the part

14 of her educators and therapists to help her restore self-worth

15 and teach her about having a healthy family life.  She's worth

16 far more than restitution can ever be provided but certainly

17 entitled to what can be given.  Thank you.

18 THE COURT:  Thank you.

19 Ms. Roth?

20 MS. ROTH:  Those are all the statements, Your Honor.

21 THE COURT:  All right.  Mr. Curtis, I have your

22 sentencing memo.  I also have the United States' memorandum as

23 well.  I did not receive any letters on his behalf.

24 Are you aware of any I'm supposed to have?

25 MR. CURTIS:  No, Your Honor.

1          THE COURT:  I have the report done by the BOP.  At

2     this point, I'll hear from you and your client as well.

3          MR. CURTIS:  Mr. Stinespring says he'd like to speak.

4          THE COURT:  Do you want to speak after he's finished,

5     then?

6          MR. CURTIS:  No, I think it be best he go now.

7          THE COURT:  That's fine.  Sir?

8          THE DEFENDANT:  When my wife wanted to adopt, I said

9     that we weren't ready.  We weren't in a stable situation in

10    our relationship, in a marriage of 30 years at that time.  And

11    as to not endure months of stomping and door slamming and

12    getting a cold shoulder, I chose to do it.  I chose to.

13    That's my doing.  I made every choice leading up to this

14    situation.

15        But a large percentage of what has been said is a gross

16    exaggeration.  M███████ suffered from reactive attention

17    deficit disorder, ADHD, and oppositional defiance disorder.

18    Day 3, I think, I opened a bottle of water for her, and she

19    screamed, threw herself on the ground, and started pulling her

20    hair out and punching herself in the face.

21        And then half an hour later, in regards to peeling a

22    banana for her, it was the same thing.  If I peeled it, then

23    she screamed.  If I didn't peel it, then she screamed.  That

24    was my life for seven years.

25        I made an enormous amount of mistakes.  Like I told --

26

1      I've told D███ over and over, I'm very sorry for those

2      mistakes.  But at no time did I act out of selfishness.

3      Except for maybe four or five times, every single time I

4      acted, I truly believed that I was doing the right thing and

5      that I was helping.

6           There was destructive behavior every single day, 24 hours

7      a day.  My wife dumped three people on me who were broken, and

8      I tried desperately to fix them, and I didn't know how.

9           I accept the wrong for what I did.  I grew up in a

10     trailer court.  My dad was a pastor.  He beat us, and he left

11     when I was two and a half.  When I was 7 years old, and I know

12     I didn't say this, but I was raped twice by a man.  His name

13     was Ed Lawton at the Christian Center Church in Pennsylvania.

14     Ever since then, I have struggled in my life not to repeat

15     anything that happened to me.

16          I truly thought -- I truly, truly to this day love

17     (indiscernible) and want nothing bad for them and would easily

18     sacrifice my life to give them back anything that I took from

19     them.  I believe that forever is forever, and they'll always

20     be part of my family no matter how bad they hate me, and I ask

21     for that forgiveness for anything I've done that might have

22     hurt them.

23                THE COURT:  Mr. Curtis?

24                MR. CURTIS:  Judge, when I met with him quite a few

25     times once we received the presentence report, along with the

1    victim impact statements, the report from the counselor, going

2    over what was what was going to take place here at sentencing,

3    Mr. Stinespring had always told me he did not want to talk.

4         And by him doing this, I think this is probably a

5    catharsis for him because he did this on his own.  I had no

6    knowledge he was going to be speaking to the Court.  I think

7    he's shown that he is worthy of a sentence that would fit the

8    factors under 3153a [*sic*], also taking into mind that he does

9    have some redeeming qualities.  He did plead guilty to serious

10   offenses.  No ifs, ands, or buts about it.  I can't deny that.

11        I know there has to be deterrence.  I know the punishment

12   has to fit the crime.  At the same time, it also has to look

13   at the individual and what is a just sentence.  He's 51 years

14   of age.  The government wants 120 years.  Needless to say, he

15   ain't gonna live that long.  But at the same time, at least

16   show him a little morsel.  As to whether or not the Court is

17   going to run the sentences consecutive or concurrent, it's

18   left up to your discretion.

19        In regards to Mr. Stinespring, like I said, this was

20   unexpected, and he did this on his own, and I think he is

21   asking for forgiveness.  And at the same time he's asking for

22   forgiveness, should we show a little mercy?  Yes.  How much is

23   left to be determined.

24        At the same time, we know he has mental, emotional, and

25   physical problems, and those problems can be best addressed by

1   the Bureau of Prisons, where he's going to have to be

2   sentenced.  I'd ask that he be sent to the medical facility in

3   Butner, North Carolina.

4           THE COURT:  I plan on making that recommendation.

5           MR. CURTIS:  Thank you, Judge.  I have nothing else.

6           THE DEFENDANT:  Can I say one more thing?

7           THE COURT:  You can.

8           THE DEFENDANT:  I didn't say what I said to get a

9   lighter sentence or anything.  It won't make any difference

10  either way.  I said what I said regardless of the sentence.

11  Do what you need to do.  God's will be done on earth as in

12  heaven.

13          THE COURT:  That's part of a prayer we say often.

14      You may proceed.

15          MS. ROTH:  Your Honor, I have thought long and hard

16  about what to say.  I have been a prosecutor for over 17

17  years, and this is the worst case that I have ever prosecuted.

18      I have tried to come up with the words to do it justice,

19  and I don't think that they exist.  I don't think I can put

20  into words the seriousness of this offense and the impact that

21  it has had on these lovely young women who have talked to you

22  today, and I certainly can't come close to being as articulate

23  as they have been about the reality that this has caused for

24  them.

25      As the Court is aware, this case got up to the eve of

1   trial a couple times.  Through the course of that, I have had

2   the privilege to meet with both Victim 1 and Victim 3 and to

3   talk with them, sometimes for hours, and I have listened to

4   what they endured, and it's unimaginable.

5       I prosecute horrible cases day in and day out, but I

6   just -- I can't understand how one human can do to another

7   human what happened to these girls.  And when I think about

8   where they were at their stage of life when they went into the

9   care of Mr. Stinespring, it's just even more unbelievable.

10      These poor children had been removed from their

11  biological family, and they were placed into the home of

12  Mr. Stinespring, and they were adopted by Mr. Stinespring, and

13  they were failed.  They were failed by the Stinesprings, and

14  they were failed by the state who left them there.

15      Victim 3 has told us the abuse had started almost

16  immediately when entering his home.  I've listened to his

17  words today and, frankly, I'm appalled that he would try to

18  blame his actions on traumatized children.

19      They have told me and they have told you that they were

20  looking for love, and they were looking for a family, and

21  Mr. Stinespring took advantage of that in the most horrible

22  way imaginable.

23      We talked throughout this case about physical abuse and

24  sexual abuse and the production of sexually explicit images,

25  and all of that is accurate.  But all of that is so benign

1   when you dig into the details of what that really meant for

2   these girls.

3       And you've hit on some of that today, but they were

4   physically tied down and branded with hot wires.  They were

5   tased on top of their feet, in their vaginal area, under their

6   armpits, in areas that are sensitive, that hurt.  I think most

7   traumatically, they were made to participate in each other's

8   abuse.

9       The manipulation that was a part of their everyday life,

10  and this Court has seen a glimpse into that manipulation just

11  through this court case, they lived that in an isolated area

12  where the only trusted adult that they had was

13  Mr. Stinespring.

14      I don't believe that was an accident.  I think that he

15  absolutely withdrew them from any possible outlet or support

16  system that they could have hoped to have through school or

17  friends or otherwise, and he moved them to isolated Kentucky,

18  where he took them out of school when they were young.

19  M█████ was 7 years old.  It's unbelievable, it really is, the

20  impact that his decisions have had on them in so many areas;

21  educationally, socially, physically.

22      And I think what you've heard and what I have heard in my

23  time meeting with them, the most painful part for them was

24  having to watch it happen to their sisters.  Each one of them

25  has talked about that actually being more difficult than

1  having to experience it themselves.

2      I've seen pictures of where they lived, and it's a tiny

3  shack, and they could hear everything, everything that was

4  happening throughout the home, and they remember.  Of course

5  they remember.  And there's just a special kind of harm that

6  that does to a child.

7      You have heard today about Mr. Stinespring threatening to

8  kill them, threatening to kill themselves, strangling them,

9  but yet having the presence of mind to say the words "I'm not

10  going to do anything that causes permanent damage."  I don't

11  believe for a single minute that this wasn't a well thought

12  out, well-planned, frankly well-executed attempt to get these

13  girls away from anyone and everyone so that he could do

14  whatever the heck he wanted to them, and that is exactly what

15  he did.

16      If it was not for the absolute courage and bravery of

17  Victim 1 in running away to a society she had been told was

18  evil, that she had been told was dangerous, that she had been

19  told there's nothing there for you, she told me, "I couldn't

20  live another day with what was happening."

21      She did that, and that is remarkable.  When you think

22  about the fact that they had been there for years without

23  outside contacts and brainwashed throughout that entire time,

24  it is remarkable that she gathered the courage to leave and

25  that she reported Mr. Stinespring and that this all came to

32

1  light.

2  It was a failure.  It was a failure that this happened to

3  begin with.  But at this stage, all we can do is try to impart

4  a sentence that gives some slight sense of justice and that

5  addresses the 3553 factors which, again, the seriousness of

6  this offense, there aren't words.  I can't do it justice, but

7  I think the Court has seen enough to understand why I say

8  that.

9  When we talk about the nature and the characteristics of

10  Mr. Stinespring, again, I think his words today give us some

11  insight into that in blaming these girls for why he did what

12  he did.  And the words that none of this was selfish, I don't

13  believe that for a minute either.

14  This defendant continued to commit crime even after he

15  was incarcerated.  He continued to attempt to obstruct

16  justice.  He continued to manipulate Victim 3.  He continued

17  to manipulate his family.  He is not unintelligent.  Quite the

18  opposite.  But he has used that for manipulation and for

19  criminal activity even, again, while he was incarcerated.

20  I think that a sentence in this case of over 100 years is

21  necessary.  I've never asked for a sentence that high.  I

22  don't do it lightly.

23  Again, I've never encountered a case with a defendant

24  like Mr. Stinespring.  And to promote justice, to promote

25  respect for the law, to deter him and others but also to

1    reflect the seriousness of this crime and the actions of this

2    defendant, I would ask for a sentence of a minimum of 100

3    years.  The maximum can, of course, go up to 120.  Somewhere

4    in that range.  I do feel like it's necessary.  I don't think

5    it's greater than necessary to achieve the sentencing goals

6    set forth in 3553.

7         That's what we'd ask the Court to do, Your Honor.

8         THE COURT:  All right.  Well, this is a very sad day

9    for quite a few people.  I absolutely appreciate the courage

10   of these young folks, these young ladies.  I'm not trying to

11   be cold and callous by referring to you as Victim 1, 3, and 2,

12   but I think that's probably the best way to do this.

13        It's also a sad day for you, Mr. Stinespring.  This will

14   be the beginning of the next stage of your life.  Hopefully,

15   the three victims can get some sense of -- be careful how I

16   say it.  Not satisfaction.  That's not the right word I'm

17   looking for.  Being able to move on, to some extent.

18        I had written down, prior to today, under my -- for every

19   sentencing that I do, I have a list of factors that are set

20   forth in 3553(a), and I make notes when I review the

21   presentence reports for various factors.

22        One of them is avoiding unwarranted sentencing disparity

23   among similarly situated defendants convicted of similar

24   offenses.  I wrote down, "no case which is even close to this

25   one."

34

1          Now, on the surface, production of child pornography,

2    possession of child pornography, and witness tampering, that

3    could be just the taking of a Polaroid.  That used to be what

4    people did back before we had the internet.  Take a Polaroid

5    of something, one image, one time.  You possess it and then

6    you try to get someone to change their story.  That could be

7    one instance of this.

8          Then you have 180 degrees the other way, which we have

9    here.

10         This is the worst case the Court has ever seen that did

11   not involve a death.  You were the adoptive father of these

12   three young ladies, one of which is still very young.  That

13   makes it worse.

14         The nature and circumstances here are as bad as I've

15   seen.  The obstruction when you were incarcerated just pours

16   gasoline on to a fire from your perspective.

17         The victim statements, their statements here this

18   morning, the letters and the statements that they submitted

19   prior to the sentencing, just substantial and reprehensible

20   abuse doled out by you.  Unspeakable things that were done.

21         Now, you're facing charges in state court regarding

22   those, and those charges will ultimately be resolved one way

23   or the other, but they are relevant conduct for purposes of my

24   sentencing.  I think I would be derelict in my duty if I

25   ignored them because, ultimately, how one's conduct impacts

1     others is perhaps the most relevant thing I can consider in

2     any case.

3         Now, you're a criminal history category 1.  I wrote down

4     also, "only redeeming quality."

5         Now, you did take these girls in.  You did.  You threw

6     your wife under the bus when you told me -- well, you can say

7     whatever you want, but you did.  You kind of threw some of

8     these young ladies under the bus.  The deflection of blame on

9     to others seems to be a pattern here that I think also is

10     relevant for sentencing.

11         The fact that you told me some very private things about

12     what happened to you, that is unfortunately something I see

13     often.  There's a cycle of abuse that happens when someone is

14     abused.  They tend to think it's okay to abuse others, and

15     then it just snowballs down the hill.

16         I certainly hope that doesn't happen here with these

17     three young ladies.  They're going to be able to get some

18     much-needed treatment.

19         This is just really sad.  Really, really sad.

20         You're in very poor health.  You tried to commit suicide

21     in jail.  We've already gone through that.  Had you evaluated.

22     That evaluation is part of the record.  I reviewed that again

23     for purposes of sentencing.

24         "A morsel of mercy," whatever that is.  Look, the

25     guidelines here, because of the nature and circumstances of

36

1    the offense, are as serious as we get here in federal court.

2    Absolutely the most serious offenses that we see.

3        When you go to the bottom of sentencing table, it says

4    "life" all the way across, category 1 through category 6.

5    And, frankly, scoring of the actual offense levels and the

6    enhancements would yield far higher than 43.  Why is that

7    relevant for sentencing?  Well, that tells me that the

8    sentencing commission has kind of determined that, look, at

9    some point, there's a law of diminishing returns here, but

10   there are cases which are worse than what this sentencing

11   table calls for, and I think this is one of those cases.

12       Before I forget, I am going to order -- John, I want to

13   make sure that the record reflects and the judgment reflects

14   the restitution in the amounts requested.

15       I'm not going to impose a fine.  I'm not going to impose

16   interest on the restitution.  I don't believe he has the

17   ability to pay interest on restitution.  In fact, I hope he's

18   able to pay the special assessment at some point, which I

19   know, by way of priority, the special assessments are paid

20   first.

21       And then the restitution would be one-third, one-third,

22   one third.  For every dollar amount, it would be one-third to

23   one victim, one to the other, one to the third regardless of

24   the amounts of restitution that are ordered.

25       Considering all of the 3553(a) factors, the nature and

1     circumstances of the offense, the seriousness of the offense,

2     the fact that the defendant tried to obstruct justice by

3     changing the mind of one particular victim to see if she would

4     take the fall for this, the fact that he's continued to kind

5     of deflect, it's really just -- I can't say it strong enough

6     to any reviewing Court.  This may be the worst case I see

7     ever, and I think the sentence that I'm about to impose is

8     going to reflect that.

9        So it's going to be the judgment of the Court that the

10    defendant, Ronald Stinespring -- when I say "worst," worst

11    where a death is not involved.

12       I'm going to order him to be committed to the custody of

13    the Bureau of Prisons to be imprisoned for a term of 360

14    months on each of Counts 1, 2, and 3, those counts to run

15    consecutively; 240 months on Count 4, to run concurrently; and

16    120 months on Count 5, that count to run consecutively to all

17    other counts, for a total sentence of 1,200 months.

18       1,200 months.

19       I'm going to recommend to the Bureau of Prisons that he

20    be designated to the Butner facility and that he participate

21    in sex offender treatment.

22       I'm going to impose terms of supervised release with the

23    understanding that you'll probably never see this portion of

24    the sentence.  But because it's required under the statute,

25    I'm going to order supervised release for terms of life on

1    Counts 1, 2, 3, and 4, to run concurrently, and three years on

2    Count 5, to run concurrently with the other terms, for a total

3    of life.

4        Within 72 hours of release from the custody of the Bureau

5    of Prisons, you must report in person to the probation office

6    in the district to which you are released.

7        I will order restitution in the amounts sought without

8    objection.  Any outstanding balance owed upon commencement of

9    incarceration will be paid in accordance with the Federal

10   Bureau of Prisons Inmate Financial Responsibility Program.

11   Any outstanding balance owed upon commencement of supervision

12   must be paid according to a schedule set by subsequent orders

13   of the Court.

14       Restitution to Victim 1 will be the amount of $42,937.50.

15       Victim 3, restitution will be in the amount of

16   $44,512.50.

17       Victim 2, $739,623.88.

18       While on supervised release, the defendant shall not

19   commit another federal, state, or local crime, must comply

20   with the mandatory and standard conditions set forth in the

21   judgment and commitment order that have been adopted by this

22   Court, and must comply with the following additional

23   conditions:

24       He must not possess a firearm, destructive device,

25   ammunition or dangerous weapon.

1    The drug testing condition required by federal statute is

2    suspended based upon the Court's determination that

3    Mr. Stinespring poses a low risk of any future substance

4    abuse.

5    In addition, he must comply with the following special

6    conditions as adopted by the Court.  All of these are designed

7    to ensure that he never has the ability to do any of this

8    again.  I believe, based upon the facts and circumstances of

9    the case and the nature and circumstances of the offense, all

10   are appropriate.

11   First, he must participate in a program for treatment of

12   mental health sexual disorders, must undergo a sex offender

13   risk assessment, psychosexual evaluation, and/or other

14   evaluation as needed.

15   He must be subject to periodic polygraph examinations,

16   computer voice stress analysis testing, and/or other

17   psychological and physiological testing at the direction and

18   discretion of Probation.

19   He must follow the rules and regulations of the sex

20   offender treatment program as implemented by Probation.

21   Any residence and employment must be preapproved by

22   Probation and in compliance with state and local law.

23   He must not frequent, volunteer, or work at any place

24   where children under the age of 18 congregate unless approved

25   in advance by Probation and have no contact directly or

1    indirectly with the victims.

2        He shall have no contact indirectly or directly with the

3    victims or any advocates on behalf of the victims while he is

4    serving his sentence either.

5        You can put that in the minutes, Madam Clerk, that he

6    shall not have contact directly or indirectly with any of the

7    victims or their advocates while incarcerated.

8        Additionally, he must not associate or have any verbal,

9    written, telephonic communications with any person under the

10   age of 18 without the permission of Probation.

11       He must not view or possess any visual depiction,

12   including any photograph, film, video, picture, or computer or

13   computer-generated image or picture, whether made or produced

14   by electronic, mechanical, or other means, of sexually

15   explicit conduct or that would compromise any treatment.

16       You must not enter any location where any such materials

17   are available.

18       You must not possess any materials depicting and/or

19   describing child pornography and/or simulated child

20   pornography as defined in the statute or that would compromise

21   any sex offender treatment.

22       You must not enter any location where such materials can

23   be accessed.

24       Additionally, you must comply with the requirements of

25   the Sex Offender Registration and Notification Act, SORNA, as

1    directed by Probation, the Bureau of Prisons, or any state or

2    qualifying sex offender registration agency in which you

3    reside, work, or are convicted of a qualifying offense, which

4    would likely include Kentucky.

5        You must not possess or use a computer or electronic

6    device with any access to online computer service at any

7    location -- that includes any library -- without the prior

8    written approval of Probation.

9        You must consent to the U.S. Probation officer conducting

10   unannounced examinations of any and all electronic devices,

11   which may include retrieval and copying of all memory from

12   hardware or software and/or removal of such systems for the

13   purpose of conducting a more thorough inspection, and you

14   consent to having installed on any such computer or electronic

15   device any hardware or software to monitor any device used to

16   prevent access to particular materials.

17       You consent to periodic information of such installed

18   hardware or software to ensure that it is functioning

19   properly.

20       Additionally, you must provide Probation with accurate

21   information about your entire computer system and all

22   electronic devices, any account user names, any passwords used

23   by you, and you must abide by the rules of electronic device

24   restriction and monitoring program implemented by Probation.

25       Additionally, you must submit your person, property,

42

1    house, residence, vehicles, storage units, papers, or

2    computers, as defined in 18 U.S. Code Section 1030(e)(1), but

3    including other devices excluded from this definition, other

4    electronic communications or cloud storage locations, data

5    storage devices or media, or offices, to a search conducted by

6    a United States Probation officer.

7        Failure to submit to a search will be grounds for

8    revocation.

9        You must warn any other occupants that the premises may

10   be subject to searches pursuant to this condition.

11       You must provide Probation with access to any requested

12   financial information.

13       I've already referenced this, but you must not

14   communicate or interact directly or indirectly with the

15   individuals referenced in paragraph 8 of the presentence

16   report.  That includes Victims 1, 2, or 3.

17       I will waive the fine, as previously stated.

18       So that will be the formal judgment of the Court.

19       Does either side have any legal objection to the sentence

20   just pronounced that was not previously raised, or does either

21   side wish the Court to address a particular 3553(a) factor

22   that you believe I have not adequately addressed?

23       MS. ROTH:  Not on behalf of the United States.  I

24   would note that back in July, you issued a preliminary agreed

25   order of forfeiture.  Ask that that be entered as part of the

43

1    judgment.

2              THE COURT:  So in the actual judgment itself?

3              MS. ROTH:  Yes.  Just referenced.

4              THE COURT:  We'll include that.

5         The 35 items referenced in the preliminary judgment of

6    forfeiture -- if you want, John, you can include that by

7    reference.

8         I don't know that we need to actually include every item,

9    unless you want me to.  You want to do an addendum to the

10   judgment?

11             MS. ROTH:  However the Court prefers.  I think by

12   reference would be fine, Your Honor.

13             THE COURT:  Let's do it by reference, then.

14        Mr. Curtis?

15             MR. CURTIS:  No objection.

16             THE COURT:  Do you wish me to make any additional

17   3553(a) findings?

18             MR. CURTIS:  The only thing, that you recommend

19   Butner.

20             THE COURT:  I'm going make that recommendation.

21        You have a right to appeal the sentence.

22        Madam Clerk, if you would read his appellate rights.

23   There's a form you'll need to sign.

24        (The form entitled "Court's Advice of Right to

25          Appeal" was read aloud in open court by the

44

1          clerk, and said form was signed by the defendant.)

2                    THE COURT:  Did you sign that?

3                    THE DEFENDANT:  Yes.

4                    THE COURT:  So you'll have 14 days from the date of

5          the entry of the judgment to effectuate an appeal.

6              Mr. Curtis, I know you will review that with him.  As you

7          know, Mr. Curtis, in the absence of him filing a notice of

8          appeal, which he has a right to do, I'm going to have you file

9          a separate notice indicating that you've discussed with him

10         the right to file an appeal and he's made a determination not

11         to.  If he doesn't appeal, you'll file this in 14 days.  If a

12         notice of appeal is filed, that would eliminate this type of

13         notice.

14                   MR. CURTIS:  Yes, sir.

15                   THE COURT:  What says the United States regarding the

16         original indictment and the superseding indictment?

17                   MS. ROTH:  Your Honor, move to dismiss those at this

18         time.

19                   THE COURT:  That motion is granted.

20             The original indictment and the first superseding

21         indictment, Madam Clerk, are dismissed.

22                   COURTROOM DEPUTY:  Yes, Your Honor.

23                   THE COURT:  What else do we need to take up regarding

24         Mr. Stinespring's case?

25                   MS. ROTH:  That's all, Your Honor.  Thank you.

45

1        MR. CURTIS:  That's all, Your Honor.

2        THE COURT:  Very well.  Defendant will be remanded to

3   custody of the marshal pending designation by the Bureau of

4   Prisons.

5        We'll be in recess.

6        (Proceedings concluded at 11:23 a.m.)

7                            - - -

8

9                   C E R T I F I C A T E

10        I, LISA REED WIESMAN RDR-CRR, certify that the
    foregoing is a correct transcript from the record of
11   proceedings in the above-entitled case.

12

13   _/s/ Lisa Reed Wiesman_            _January 20, 2023_
    LISA REED WIESMAN, RDR-CRR         Date of Certification
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25